# Illinois Official Reports

## Appellate Court

---

### *People v. Irwin*, 2017 IL App (1st) 150054

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KRISTOPHER IRWIN, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-0054 |
| Filed<br>Rehearing denied | May 2, 2017<br>May 25, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-C4-40256(02); the Hon. Gregory Robert Ginex, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Christofer R. Bendik, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Eric Leafblad, Miles J. Keleher, and Jesse B. Guth, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justice Pierce concurred in the judgment and opinion.<br>Presiding Justice Hyman dissented in part, with opinion. |

**OPINION**

¶ 1    On March 4, 2012, around 7:30 p.m., police officers in Maywood responded to a radio call of "shots fired." On their way to the location specified in the call, the officers saw a vehicle traveling at high speed run through a red light and head past them in the opposite direction. The officers pursued the car with lights and siren activated, but the car did not stop until blocked by another responding police vehicle. After all four occupants exited the car, one of the officers discovered a handgun on the floor in the front passenger seat where defendant Kristopher Irwin had been sitting. Irwin was tried and convicted of aggravated unlawful use of a weapon (AUUW) based on his failure to possess a valid Firearm Owner's Identification (FOID) card. 720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2010). Irwin was sentenced to three years' imprisonment.

¶ 2    Irwin raises several issues on appeal relating to the admission of evidence during his trial. Finding no error warranting a new trial, we affirm.

¶ 3                                   BACKGROUND

¶ 4    Maywood police officer Joseph Escamilla was on patrol in a marked police car on the evening of March 4, 2012. Around 7:30 p.m., he received a "shots fired" call over his police radio. Escamilla's partner, Officer Danielle Deering, accompanied him, and they drove southbound on 17th Avenue toward the Eisenhower expressway. As they approached the bridge across the expressway, they saw a four-door Dodge sedan, travelling at a high rate of speed, make a left turn as it went through a red light and head northbound past them on 17th Avenue. Escamilla activated his vehicle's lights and siren, made a U-turn, and followed. The driver did not stop or slow down, but as he tried to make a right turn onto Van Buren Street, the driver was cut off by Officer Aaron Peppers' police car. Peppers was responding to Escamilla's radio call regarding the fleeing vehicle. Peppers immediately exited his vehicle and shouted commands to the occupants of the Dodge to put their hands up and keep them visible.

¶ 5    Escamilla parked behind the Dodge. He approached on the driver's side and instructed Deering to approach the passenger side. Escamilla acted as the business officer, *i.e.*, the officer who questions the driver during a traffic stop, and Deering acted as the guard officer, whose job it is to ensure the safety of the officers and occupants of the vehicle. Peppers observed from in front of the Dodge.

¶ 6    Escamilla illuminated the inside of the Dodge with his car's spotlight and his own flashlight. He could see there were four occupants but could not determine their race or gender. As he approached the driver's door, Escamilla saw through the rear window that the person in the front passenger seat (later identified as Irwin) made a "sudden movement." Escamilla was about five feet away and described Irwin's movement as "his body just drop[ped] very quickly" a few inches as he bent down at the waist and then came back up. The movement only took a second or two. Neither Deering nor Peppers noticed Irwin's movement, nor did they see any of the other occupants move after the Dodge was stopped.

¶ 7    The car had two bucket seats divided by a console in the front and a bench seat in the rear. Escamilla asked the driver for his license, but the driver did not have one, so Escamilla ordered him out of the car and had him stand in front of Peppers' vehicle. Escamilla then directed Irwin

out of the car and had him stand with his hands on the hood of the Dodge. Escamilla directed the individual sitting in the rear passenger side seat to get out next and also had him place his hands on the hood of the car. About 10 seconds passed between the time Irwin got out of the car and the person sitting in the rear passenger side seat exited. When the fourth occupant sitting in the rear driver's side seat (Irwin's co-defendant Derrick Craddock) got out of the car, he pushed Escamilla and tried to flee.

¶ 8    By this time, Officer George Adamidis had arrived on the scene. Escamilla grabbed Craddock by the waist and felt a blunt object in his waistband. With Deering's assistance, Craddock was handcuffed, and Adamidis recovered a 9mm Beretta handgun from his waistband.

¶ 9    Once all the occupants were out of the Dodge, Deering did an inventory search and removed from the floor of the front passenger seat area a black 9mm BPI handgun. The gun was over an inch thick. Neither Escamilla nor Deering had seen the gun in the car as they were standing on opposite sides of the car before directing the occupants out, and neither had seen Irwin with a gun. The gun was in plain view and would have been inches from Irwin's feet while he was in the car. About three minutes passed between the time Irwin exited the car and Deering found the gun.

¶ 10    Deering was not watching the rear passengers during the entire encounter, but it would have been difficult for a person sitting in the rear passenger seat to reach between the front seats to deposit a gun on the floor without being noticed. There was space under the front seats, but Deering did not remember how that area appeared. Deering could not see the feet of the rear passengers until the door opened.

¶ 11    Adamidis took the gun from Deering and cleared it of ammunition. It was fully loaded with one bullet in the chamber. The gun was never tested for fingerprints, and a trace of its serial number did not reveal Irwin as the owner. Irwin was arrested and later charged with AUUW.

¶ 12    Craddock ultimately pled guilty. Before trial, Irwin's counsel filed several motions *in limine* to exclude testimony. The trial court ruled that (i) the police witnesses could testify they knew Irwin but not about any other arrests or encounters, (ii) the officers could testify that they pulled over the Dodge while responding to a "shots fired" call over the police radio but not elaborate further, and (iii) the State could not comment on Irwin's silence after his arrest. Irwin's counsel made a standing objection to testimony concerning the "shots fired" radio call. The State asked for a few minutes so that it could advise its witnesses of the court's rulings and the parameters of their testimony.

¶ 13    At trial, the officers recounted the events described above. The State referenced the "shots fired" call in its opening statement, and Escamilla, Deering, and Peppers all testified that they responded to a "shots fired" call but did not provide any further details. Irwin's counsel objected to the prosecutor's and witnesses' references to "shots fired." The State made no mention of a "shots fired" call in closing or rebuttal argument, instead referring to it once as an "emergency call."

¶ 14    State's Exhibit 2 was a photograph of Irwin taken on the night he was arrested. The exhibit consists of a black and white photocopy of two photographs of Irwin, laid out next to each other. One photograph is a frontal shot of Irwin's head and shoulders; the photograph next to it is a profile shot of Irwin's head and shoulders. In the photos, Irwin had longer curly hair and was wearing a dark T-shirt. Based on the record, we can conclude that Irwin's hair was shorter

at trial and he was wearing a shirt and tie. No number or other identifying information is on the photos.

¶ 15    The State first used Exhibit 2 with Escamilla. Irwin's counsel objected. Out of the presence of the jury, counsel argued that Irwin was not contesting that he was the man who had been sitting in the front passenger seat of the Dodge and that since identification was not at issue, admission of the "mug shot" would be irrelevant and prejudicial. The State argued that the exhibit was relevant to the police's recognition of Irwin, and since Irwin looked different at trial, the "jury is entitled to see who the officers removed from the vehicle." Irwin's counsel responded that the State's reason for submitting this photo was "they think he looks more like a thug in this picture than he does now." The trial court ruled that Exhibit 2 was not a mug shot and allowed the State to use it over Irwin's objection.

¶ 16    At one point in Adamidis's testimony, the prosecutor asked how he recognized Irwin, to which Adamidis replied, "multiple street encounters." As this response violated the court's order *in limine*, the court sustained Irwin's objection, struck the testimony, and instructed the jury to disregard it. Irwin's counsel later moved for a mistrial based on this testimony. The trial court denied the motion.

¶ 17    The prosecutor then asked Adamidis if he recognized Irwin from the traffic stop, and Adamidis replied that he did. The prosecutor further queried "but the defendant didn't look like he does now, does he?" Irwin's objection was overruled. Adamidis identified Exhibit 2 as a photograph of Irwin as he looked at the time of the traffic stop.

¶ 18    Although the State did not originally seek to publish Exhibit 2 to the jury, it later did so and, again over defense counsel's objection, the exhibit was admitted into evidence and sent back to the jury room.

¶ 19    During Deering's cross-examination, she was asked about the police report of the incident and testified that she did not prepare it but read it in preparation for her testimony. She also prepared to testify by meeting with the prosecutors, while Escamilla and other police officers were present. On redirect, the prosecutor asked Deering about the preparation of her testimony and then asked "didn't I tell you I only wanted you to tell the truth?" Irwin's objection to this question was overruled. Deering agreed that the prosecutor had given her those instructions.

¶ 20    Irwin's counsel also asked that the State be prevented from arguing during closing that the Dodge was "fleeing," but the trial court denied the request, finding that it was a reasonable inference from the evidence. The court also denied Irwin's request for a jury instruction on the "shots fired" call, which would have informed the jury of the limited purpose for which the testimony was admitted and that it could not be considered for the truth of the assertion that shots were, in fact, fired.

¶ 21    Before closing arguments, the trial court instructed the jury that the arguments were not evidence. The State argued that the officers saw the Dodge "fleeing" the vicinity of "an emergency call that they were responding to." There was no other mention of the "shots fired" call in the State's opening or rebuttal closing argument.

¶ 22    Irwin's counsel argued that there was no evidence linking Irwin to the gun; it was not registered to him and no fingerprints were recovered. Counsel noted that Irwin had not been nervous or sweaty when he got out of the car as would be expected if he knew a gun was on the floor by his seat. In rebuttal, the State argued that Irwin had no reason to be nervous because he believed the police would not find the gun and went on: "what does he do when he gets out? He

- 4 -

doesn't, he's not under arrest. He doesn't alert the officer *** for her own safety that there's a gun on that floor board, not mine. He doesn't say anything about that gun." Irwin's objection to this argument was sustained.

¶ 23 Irwin was convicted of aggravated unlawful use of a weapon. In his posttrial motion, Irwin argued that (i) the "shots fired" testimony was hearsay that violated his rights under the Confrontation Clause, (ii) admission of the photographs taken of him the night he was arrested was error, (iii) the State impermissibly vouched for the credibility of Deering and commented on Irwin's silence after arrest, and (iv) Adamidis violated the *in limine* order by referring to his "street encounters" with Irwin. Irwin's posttrial motion was denied and he timely appealed.

¶ 24                                                    ANALYSIS

¶ 25 At oral argument, the State conceded that two errors were committed during Irwin's trial: first, the State conceded that the trial court should have given the jury a limiting instruction regarding the "shots fired" testimony; second, the State admitted that the photographs of Irwin should not have been sent to the jury room, although it contends the photographs were properly admitted into evidence. The State maintains, however, that neither of these errors, nor any of the other issues raised by Irwin, warrant a new trial.

¶ 26 As to those errors the State has conceded or that we find occurred, the State bears the burden to show that they are harmless beyond a reasonable doubt. *In re Brandon P.*, 2014 IL 116653, ¶ 50 ("Confrontation clause violations are subject to harmless error review."); see also *People v. Jacobs*, 2016 IL App (1st) 133881, ¶¶ 77-78 (improper admission of evidence subject to harmless error review); *People v. Campbell*, 2012 IL App (1st) 101249, ¶¶ 32-33 (reviewing trial court's failure to give limiting instruction for harmless error).

> "When determining whether an error is harmless, a reviewing court may '(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence.' " *In re Brandon P.*, 2014 IL 116653, ¶ 50 (quoting *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008)).

¶ 27 All but one of the errors raised by Irwin on appeal concern the trial court's rulings on the admission of evidence. A trial court's evidentiary rulings are discretionary, and therefore, such rulings will not be overturned absent an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001) (Illinois courts apply abuse of discretion standard when reviewing trial court's decision admitting hearsay). An evidentiary ruling constitutes an abuse of discretion when it is arbitrary, fanciful, or unreasonable. *People v. Hanson*, 238 Ill. 2d 74, 101 (2010); *Caffey*, 205 Ill. 2d at 89. A court may exercise its discretion and exclude evidence, even if it is relevant, if the danger of unfair prejudice substantially outweighs its probative value. *Hanson*, 238 Ill. 2d at 102; Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 28 Irwin first argues that the "shots fired" radio call—used in the State's opening statement and in officer testimony—was inadmissible hearsay and violated his right to confront his accusers. Both the federal and state constitutions guarantee the right of confrontation. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Because the declarant is not available for cross-examination, hearsay evidence—an out-of-court statement offered to prove the truth of the matter asserted—can violate a defendant's right to confront the witnesses against him. *People v. Peoples*, 377 Ill. App. 3d 978, 983 (2007); *People v. Jura*, 352 Ill. App. 3d 1080,

1085 (2004) ("The fundamental reason for excluding hearsay is the lack of an opportunity to cross-examine the declarant.").

¶ 29    Generally, hearsay evidence is inadmissible. Ill. R. Evid. 802 (eff. Jan. 1, 2011). An exception exists when the evidence is "offered for the limited purpose of showing the course of a police investigation where such testimony is necessary to fully explain the State's case to the trier of fact." *People v. Williams*, 181 Ill. 2d 297, 313 (1998) (admitting contents of 911 tape to show officer acting in the course of his official duties); *Jura*, 352 Ill. App. 3d at 1085. Specifically, police officers can testify to the statements of others when such evidence is not offered to prove the truth of the matter asserted but for the officer to explain investigative steps. *People v. Rush*, 401 Ill. App. 3d 1, 15 (2010). Because such testimony referencing statements of others can impinge on the right of confrontation and is subject to abuse, it should be admitted sparingly and only when necessary. See *People v. Cameron*, 189 Ill. App. 3d 998, 1004 (1989) (" 'The need for the evidence is slight, the likelihood of misuse great.' " (quoting McCormick on Evidence § 249, at 734 (Edward W. Cleary ed., 3d ed. 1984))). Further, such evidence when admitted should be accompanied by an instruction to the jury describing the limited purpose for its admission. *Williams*, 181 Ill. 2d at 313-14.

¶ 30    The trial court certainly could have, in the exercise of its discretion, determined that reference to an "emergency call" would have adequately informed the jury why the police gave chase to the Dodge. Without being told that the call message was "shots fired," the jury could readily have concluded that the emergency was of a serious nature, given Peppers' conduct in cutting off the Dodge and immediately ordering the vehicle's occupants to put up their hands.

¶ 31    The existence of discretion—here, whether or not to admit evidence—necessarily means that not only one correct answer exists. For if that were true, the ruling would not be discretionary. See *People v. Witherspoon*, 379 Ill. App. 3d 298, 310 (2008) (upholding a trial court's finding under abuse of discretion standard of review does not necessarily mean an opposite finding would be an abuse of discretion). And our role on review is not to substitute our judgment for that of the trial court. *People v. Cookson*, 335 Ill. App. 3d 786, 793 (2002); see also *People v. Braddy*, 2015 IL App (5th) 130354, ¶ 32. So even if we believe that advising the jury of an "emergency call" would have sufficed, we must still decide whether the trial court abused its discretion in determining that references to "shots fired" were admissible.

¶ 32    Here, a reasonable trial judge could have concluded that the fact that police were responding to a call of "shots fired" was necessary to inform the jury of the reason why Escamilla and Deering, instead of proceeding to the location to which they were directed by the radio call, decided to pursue a vehicle they saw run a red light. Without the context of the call, the jury would be left to wonder why officers decided to divert from responding to the scene. Further, if the driver's only offenses were speeding and running a red light, the reason Escamilla called for backup would have been unexplained and Peppers' use of his vehicle to block the Dodge would have appeared extreme. Upon eventually curbing the vehicle, the officers' conduct in directing all of its occupants to raise their hands and get out of the car is inexplicable unless a jury understands the nature of the radio assignment to which police were responding. Finally, the call of "shots fired" did not relate to or tend to prove the offense with which Irwin was charged. Therefore, we find no abuse of discretion in the court's decision to permit this testimony in the first instance.

¶ 33    That said, it was unnecessary for three officers to repeat the contents of the radio call. Once the jury understood from Escamilla's testimony the nature of the call, no more needed to be

said to explain the officers' actions. But repetition of the "shots fired" testimony does not render this otherwise admissible evidence reversible error, particularly where the record reveals that, other than to state the reason for their actions, the officers did not dwell on the radio call. Further, as noted, the call of "shots fired" did not relate to the essence of the gun possession charge against Irwin. *Cf. Jura*, 352 Ill. App. 3d at 1088 (testimony regarding contents of radio call "directly impact[ed] the very essence of the dispute"). Finally, the State did not refer to the "shots fired" call in closing or rebuttal, stating only that officers responded to an "emergency call," and the State did not suggest or imply that the vehicle in which Irwin was riding was the source of the shots fired.

¶ 34    Irwin argues that this case is like *Jura*, where three officers testified to the substance of a " 'person with a gun' " radio call. Id. at 1083-84. The radio call also described the offender as a white male with a teardrop tattoo on his cheek, details that the officers were permitted to relay in their testimony. *Id.* When the officers reached the specified location, they saw Jura and several other men. *Id.* The officers testified that Jura " 'match[ed] the description' " of the offender and that they observed Jura throw a gun into a garbage can. *Id.* Jura testified and denied committing the offense. *Id.* at 1082. Reversing Jura's conviction, we found that the testimony about the radio call, which "directly impact[ed] the very essence of the dispute: whether the defendant was the man who possessed the gun," was not harmless because it was testified to by several witnesses, contained substantive information used to prove Jura guilty, and was exploited by the State in closing argument by emphasizing to the jury that Jura "matched the description." *Id.* at 1088, 1090.

¶ 35    In *Jura*, the central question was who owned the gun the officers found in the alley. The officers testified they saw Jura holding the gun, but Jura denied this. The State was able to use the 911 caller (who was never produced or cross-examined) to bolster the credibility of the police witnesses. In this context, we determined the content of the radio call (particularly the offender's physical description) was vital to the outcome, and any error in admitting it was, therefore, not harmless. *Id.* at 1091.

¶ 36    Here, the "shots fired" testimony could not bolster the credibility of Officers Escamilla and Deering. There is no dispute that two guns were found that night: one in Craddock's waistband and one on the front passenger floor near where Irwin sat. And the jury was repeatedly instructed that evidence regarding the weapon recovered from Craddock was not to be considered against Irwin. Moreover, the jury heard that Irwin's gun was fully loaded with a bullet in the chamber, and there would thus be no basis for the jury to assume that Irwin was the person who fired the shots leading to the call.

¶ 37    While the State concedes and we agree that the trial court should have given a limiting instruction to the jury, the failure to do so does not warrant reversal. See *People v. Pistonbarger*, 142 Ill. 2d 353, 377 (1990) ("Although it is not mandated in every case, *** it is constitutionally permissible for a reviewing court to determine that given the facts of the individual case, the result would have been the same had the defect in the [jury] instructions not been present."); *People v. Austin*, 133 Ill. 2d 118, 124 (1989) ("[A]ny error in giving or refusing instructions will not justify a reversal when the evidence in support of the conviction is so clear and convincing that the jury's verdict would not have been different.").

¶ 38    There was ample evidence to sustain Irwin's conviction. It is undisputed that Irwin sat in the passenger seat of the Dodge and that the fully loaded gun was recovered inches away from where his feet would have been. No occupant of the vehicle, other than Irwin, was observed

moving after the Dodge was stopped. On the other hand, Escamilla, who was unimpeached, observed Irwin bending down in a movement that could reasonably have been interpreted as an effort to remove the gun from his person, and the gun's location in the vehicle was consistent with that inference. No other occupant of the vehicle was observed reaching over or around the front seat (in the case of the backseat passengers) or the console (in the case of the driver). That leaves Irwin's suggestion to the jury that the backseat passenger could have dropped the gun and pushed it under the seat with his feet in the minute or so after the Dodge was stopped so that it came to rest in the front passenger seat area. While we suppose that such a scenario, although not supported by the evidence, is within the realm of possibility, it does not cause us to question the strength of the State's case.

¶ 39 Irwin emphasizes that the gun was not tested for fingerprints and that its serial number did not reveal him as the owner. But while the presence of fingerprint or ownership evidence would have rendered the State's case irrefutable, its absence does not, in our view, render the evidence of Irwin's guilt less than overwhelming.

¶ 40 And even if the jury assumed the truth of the assertion that, in fact, shots had been fired, this does not make more likely Irwin's possession of the weapon found in the front passenger seat area. Consequently, we conclude that the trial court's failure to give a limiting instruction did not contribute to Irwin's AUUW conviction, and therefore, we find this instructional error harmless beyond a reasonable doubt.

¶ 41 Irwin next argues that he was deprived of a fair trial when the State was allowed to admit into evidence and send to the jury the two photographs of him taken on the night of his arrest. Irwin argues that the photographs were "mug shots" and were irrelevant and prejudicial as there was no issue regarding either the fact that he was present on March 4, 2012, or the officers' ability to identify him in court.

¶ 42 The State contends that Exhibit 2 was not a "mug shot" because it "does not indicate or imply prior criminal activity" by Irwin. There was no legend on the photograph indicating a prior arrest, and all of the officers who testified regarding the photograph indicated that it was taken at the time of Irwin's arrest for this crime.

¶ 43 While the State may be technically correct that Exhibit 2 was not a "mug shot" of Irwin because it was generated contemporaneously with his arrest, we nevertheless believe the jury would have treated the exhibit as such. Courts have noted that "a person of even subnormal intelligence would know that the front and side profile snapshots were all 'mug shots.' " *People v. Woodruff*, 62 Ill. App. 3d 949, 954 (1978). We cannot think of another circumstance where a person's front and profile photographs are presented together. This arrangement is "common knowledge to the public from their exposure to the same in the news media, television, and *** on the walls of the vast majority of police stations and post offices throughout the United States." *People v. Wheeler*, 71 Ill. App. 3d 91, 97 (1979).

¶ 44 But introducing a defendant's photograph, even one taken in the police station, is not inherently prejudicial. The reason mug shots are generally excluded from evidence is because they imply that the defendant has been previously arrested. See *People v. Nelson*, 193 Ill. 2d 216, 224 (2000); *People v. Arman*, 131 Ill. 2d 115, 123 (1989). For example, a jury's awareness that a witness or victim identified the defendant from a mug shot already in law enforcement's possession, while admissible, clearly indicates possible involvement by the defendant in other criminal activity. On that rationale, we generally exclude use of such evidence, except in limited circumstances, because we do not want jurors to convict a

defendant based on prior conduct outside the scope of the trial. *People v. Murdock*, 39 Ill. 2d 553, 562 (1968) ("We agree that the front and profile views of the defendant in the photographs might very well suggest to the jury that they were 'mug' shots taken for police files and, since there was no probative purpose for their admission into evidence, find that the photographs were erroneously admitted."). Here, because all of the witnesses testified that the photos of Irwin were taken on the night he was arrested, there would be no basis for the jury to presume they were anything else. In other words, although Exhibit 2 *became* Irwin's "mug shot" because of his arrest, it was not the type of evidence that suggests other criminal activity.

¶ 45    This does not end our analysis. While in the context of this case, the photographs do not carry the inherent prejudice of mug shots because they do not imply other criminal activity, Irwin is correct that the photos were irrelevant to any issue the jury was called upon to decide. Generally, evidence is admissible if it is relevant. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 46    The trial court abused its discretion in admitting the photographs because they did not meet the threshold requirement of relevance. The photographs did not make "the existence of any fact *that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence." (Emphasis added.) Ill. R. Evid. 401 (eff. Jan. 1, 2011). The fact that Irwin had longer hair and was not as neatly dressed at the time he was arrested does not make it any more or less likely that he possessed the weapon found where he was sitting. And we agree with Irwin that the only apparent purpose for admitting the photographs was to show the jury that the neatly attired young man in court did not appear that way on the night he was arrested (which, incidentally, is another thing that jurors generally know).

¶ 47    And even if Irwin's appearance when he was arrested was relevant, the State needed only one front-facing photograph to illustrate the point. We can discern no reason, and the State has articulated none, why it was necessary for Irwin's jury to see both photos. Beyond that, there was certainly no reason for the exhibit to be sent to the jury room. Michael H. Graham, Graham's Handbook of Illinois Evidence § 401.8, at 184 (10th ed. 2010) ("It is preferable not to permit the mug shots to go to the jury room."); *People v. Burrell*, 228 Ill. App. 3d 133, 144 (1992) (potentially prejudicial evidence must be closely scrutinized, since "evidence present in the jury room during deliberations gives the party producing it a distinct advantage").

¶ 48    Given our finding that the trial court should not have permitted the State to use this exhibit because it was irrelevant and arguably prejudicial, and in light of the State's concession that it was error to allow the exhibit to go to the jury room, we must determine whether these errors are harmless beyond a reasonable doubt. In the context of this case, we find that they are. See *Nelson*, 193 Ill. 2d at 224 ("When admitted in error, 'mug shot' evidence will not warrant a reversal when competent evidence establishes the defendant's guilt beyond a reasonable doubt, and it can be concluded that retrial without the challenged evidence would produce no different result.").

¶ 49    As discussed above, the State sustained its burden to prove Irwin guilty beyond a reasonable doubt through admissible evidence that, in our view, was overwhelming. Moreover, similar to issues relating to the radio call, Irwin's appearance on the night he was

arrested did not go to the essence of the charge against him. In other words, there is nothing in Irwin's appearance in the photographs that would lead a juror, otherwise unpersuaded by the State's evidence, to convict Irwin of possession of the weapon. Therefore, we find the error in admitting the photographs and sending them to the jury harmless beyond a reasonable doubt.

¶ 50    Next, Irwin argues that the prosecutor improperly vouched for Deering's credibility by asking Deering on redirect, "didn't I tell you I only wanted you to tell the truth?" This question was in response to cross-examination regarding Deering's witness preparation meeting with the State.

¶ 51    Irwin mischaracterizes the situation; this was not vouching for witness credibility. In fact, not a single one of the cases Irwin cites in his briefs is factually analogous to what happened here. Asking this question of Deering is not akin to a prosecutor suggesting in closing argument that the prosecutors had " 'checked *** out' " and " 'corroborate[d]' " the witness's statement with forensic evidence before accepting it (*People v. Williams*, 2015 IL App (1st) 122745, ¶ 10) or saying that the prosecutor himself could " 'cut through the BS and have a way to find out who is telling the truth' " (*People v. Schaefer*, 217 Ill. App. 3d 666, 668 (1991)).

¶ 52    The statements in *Williams* and *Schaefer* were improper for two reasons: (i) the statements might give the jury the impression that there is "secret" evidence, known only to the State, that supports the charge against the defendant or (ii) they might induce the jury to trust the State's judgment over their own evaluation of the evidence. *Williams*, 2015 IL App (1st) 122745, ¶ 13. But here, there was no reference to unknown evidence or any suggestion that the jury should trust the prosecutor's judgment rather than their own evaluation of Deering's credibility. Even if the jury accepted the implied proposition that the prosecutor had instructed Deering to tell the truth, it would still have to decide on its own whether Deering followed that instruction. Irwin was not deprived of a fair trial by this action.

¶ 53    Irwin argues that he was denied a fair trial when the prosecutor elicited testimony from Officer Adamidis that Adamidis recognized Irwin from "multiple street encounters." The trial court sustained Irwin's objection to this testimony, struck Adamidis's response, and instructed the jury to disregard it.

¶ 54    The testimony violated the trial court's *in limine* order, but it did not deprive Irwin of a fair trial. A timely, sustained objection and instructing the jury to disregard the testimony can correct this type of error. See *People v. Hall*, 194 Ill. 2d 305, 342 (2000) (State's question regarding defendant's prior criminal activity improper, but error cured by sustaining objection and admonishing jury to disregard). The testimony was not so prejudicial as to be incurable and deny Irwin a fair trial.

¶ 55    Irwin also objects to the statement in the prosecutor's rebuttal quoted above, which was made in response to defense counsel's argument that there was no evidence that Irwin appeared nervous or sweaty when he exited the car. Irwin's objection to this argument was immediately sustained. While the standard of review of alleged errors in closing argument is uncertain (compare *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) (whether statements made by prosecutor during closing argument were so egregious as to warrant a new trial is a legal issue to which *de novo* standard of review applies), with *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (trial court's determination of the propriety of closing argument will not be disturbed absent an abuse of discretion)), we have no trouble concluding under either standard that this isolated remark played no role in Irwin's conviction.

¶ 56    Prosecutors are afforded "wide latitude" in closing argument, and improper argument in closing warrants reversal only if the improper remark constituted a "material factor" in the conviction. *Wheeler*, 226 Ill. 2d at 123. We are not convinced that the prosecutor's remark was a material factor: the remark was isolated, it was responsive to defense arguments regarding Irwin's demeanor prior to his arrest, the trial court immediately sustained Irwin's objection, and it properly instructed the jury that closing arguments are not evidence. See *People v. Moore*, 171 Ill. 2d 74, 105-06 (1996) ("[t]he act of sustaining an objection and properly admonishing the jury is usually viewed as sufficient to cure any prejudice"); *People v. Wiggins*, 2015 IL App (1st) 133033, ¶ 59. Moreover, because Irwin was not under arrest at the time he was directed out of the car, the prosecutor's argument was not, as Irwin contends, a comment on his postarrest silence. Consequently, we conclude that this single remark did not deprive Irwin of a fair trial.

¶ 57    Finally, Irwin argues that the cumulative errors committed during his trial denied him a fair trial. Ordinarily, a new trial is not warranted where a defendant raises several contentions of error, none of which rise to the level of reversible error, because " '[t]he whole can be no greater than the sum of its parts.' " *People v. Sullivan*, 366 Ill. App. 3d 770, 786-87 (2006) (quoting *People v. Albanese*, 102 Ill. 2d 54, 82-83 (1984), *abrogated on other grounds in People v. Gacho*, 122 Ill. 2d 221 (1988)). Nevertheless, there may be circumstances where the cumulative impact of otherwise harmless errors deprives a defendant of a fair trial and mandates reversal. See, *e.g.*, *Albanese*, 102 Ill. 2d at 83 (citing *People v. Killian*, 42 Ill. App. 3d 596, 601 (1976)). However, given the straightforward nature of the evidence, which was essentially uncontradicted and which established the presence of a weapon where Irwin was sitting, discovered shortly after he exited the vehicle, the errors we have identified in this case, even when considered cumulatively, do not rise to this level.

¶ 58    Affirmed.

¶ 59    PRESIDING JUSTICE HYMAN, dissenting in part.

¶ 60    While the majority rightly concludes that the "shots fired" call merited a limiting instruction, and that the "mug shot" was irrelevant and should not have been allowed in the jury room, I respectfully must part ways at the impact of those errors. The majority believes that they were harmless beyond a reasonable doubt. I disagree—the errors, combined with others that the trial court tried to cure, collectively rise to the level of cumulative error, depriving Irwin of his right to a fair trial. Accordingly, I would overturn Irwin's conviction and remand for a new trial.

¶ 61    Kristopher Irwin's trial was replete with mistakes:

    (i) Evidence that should have been admitted only for limited purposes (the "shots fired" 911 call) was instead admitted without limiting instructions;

    (ii) Irrelevant and unduly prejudicial evidence (the "mug shot") was admitted and sent to the jury room for no reason whatsoever;

    (iii) Even when the trial court did properly limit prejudicial evidence, the State's witness violated a motion *in limine* by testifying that he recognized Irwin from "multiple street encounters"; and

(iv) The prosecutor went on to improperly comment during closing argument on Irwin's silence.

¶ 62      In concluding that these errors were harmless, the majority relies on the gun's location on the floor of the Dodge (near where Irwin's feet would have been) and Officer Escamilla's observation that Irwin made a "movement" during the traffic stop that could be construed as Irwin dropping the gun. This evidence may have been legally sufficient, in the sense that a reasonable trier of fact, viewing this evidence in the light most favorable to the State, could conclude Irwin was guilty. *People v. Campbell*, 146 Ill. 2d 363, 374 (1992). But that is not the same thing as saying that this evidence was "overwhelming," so that the error was harmless beyond a reasonable doubt. *People v. Patterson*, 217 Ill. 2d 407, 434 (2005); see also *People v. Hogan*, 388 Ill. App. 3d 885 (2009) (finding evidence was sufficient to support conviction but not overwhelming for harmless error analysis).

¶ 63      That the majority characterizes the evidence as being overwhelming does not hold. No witness saw Irwin holding or using the gun. No forensic evidence (such as his fingerprints on the gun) was presented. The gun was found on the floor of a car that Irwin did not own and was not controlling at the time of the offense. And another of the car's occupants was found with a gun in his waistband, and a third passenger was sitting directly behind Irwin's seat, with space between the car's floor and the bottom of Irwin's seat.

¶ 64      Again, the State's case turns solely on the location of the gun and Officer Escamilla's observation—though the scene was so dark that Escamilla could not make out the race or gender of the car's occupants and the other officers conducting the stop did not see Irwin's "movement." At best this evidence is thin and inconclusive, not overwhelming.

¶ 65      Compare this case with one like *Patterson*, where the defendant was the last person seen with the victim before the victim's disappearance, the victim's body was found with a blanket similar to a blanket belonging to the defendant, and (most tellingly) the victim's DNA was found in a blood stain on the defendant's living room carpet. 217 Ill. 2d at 433-35. The evidence in *Patterson* was circumstantial but nonetheless "overwhelming." There is no compelling forensic evidence inculpating Irwin or evidence pointing to him alone as the culprit (as opposed to the three other men in the car). Or a case like *People v. Mullins*, where three police officers, whose testimony was unimpeached, watched Mullins make multiple heroin sales during a half-hour period. 242 Ill. 2d 1, 25 (2011). The case against Mullins consisted of direct observations of illegal actions; no inferences needed to be drawn (as must be drawn here between an ambiguous movement and the gun's position on the floor, the only basis on which the jury could have concluded that Irwin possessed the gun).

¶ 66      Reviewing the trial proceedings as a whole, I am not convinced that Irwin would have been convicted regardless of these errors. *Id.* at 23.

¶ 67      Irwin also raised a number of other claims. While I agree with the majority that the State did not improperly vouch for Officer Deering's credibility, the remaining claims (the "multiple street encounters" testimony and the commentary on Irwin's silence) should not be taken in isolation but examined together in the context of their cumulative effect. See *People v. Blue*, 189 Ill. 2d 99, 139 (2000) (finding that cumulative errors "created a pervasive pattern of unfair prejudice to defendant's case").

¶ 68      Before trial, the trial court ruled that police witnesses could not testify that they knew Irwin from prior arrests or encounters; yet, when asked how he recognized Irwin, Officer Adamidis replied, "multiple street encounters." The trial court tried to cure this unmistakable violation by

sustaining an objection, striking the testimony, and instructing the jury to disregard it. Whether this testimony stemmed from a deliberate attempt to violate the *in limine* ruling or simply poor witness preparation, it was impermissible and had the highly prejudicial effect of painting Irwin as a criminal, an effect further emphasized by the use of the mug shot.

¶ 69 During closing argument, the State told the jury that Irwin had not mentioned to Officer Deering that there was a gun in the car. The trial court sustained Irwin's objection. I disagree that this statement was responsive to defense argument that Irwin wasn't nervous during the traffic stop: the prosecutor could have responded that Irwin did not believe the gun would be discovered without going on to chastise him for not alerting Officer Deering to the gun's presence "for her own safety." The prosecutor did not need to comment on his lack of speech, or imply that he failed to inform Officer Deering about the gun because he nefariously wished her harm. This error ties in to the use of the "shots fired" call, again embroidering possession of a gun into intent to cause bodily harm with that gun.

¶ 70 All four of the errors listed above fall into this pattern of painting Irwin as a hardened, dangerous criminal committing serious crimes. When the 911 call and the mug shot are added to the "multiple street encounters" and the commentary on silence, it shows a pattern of unfair prejudice that, cumulatively, denied Irwin his fundamental right to a fair trial. Again, the State's evidence was purely circumstantial, and at every turn, the State attempted to strengthen that evidence by making Irwin appear as dangerous as possible.

¶ 71 When considering the weight of all these errors, what matters most is whether Irwin received a fair trial, regardless of the strength of the State's evidence. See *Blue*, 189 Ill. 2d at 139 (though evidence against defendant was "overwhelming," new trial ordered to "preserve the trustworthiness and reputation of the judicial process").

¶ 72 The net effect of the multiple errors rendered Irwin's trial fundamentally unfair and unreliable; he is entitled to a new trial.