2023 IL App (1st) 220318-U

FOURTH DIVISION
Order filed April 13, 2023

No. 1-22-0318

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of Cook |
| Plaintiff-Appellee, | ) | County. |
| | ) | |
| v. | ) | No. 19 CR 5791 |
| | ) | |
| CHARLIE BOOKER | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Lampkin and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1 *Held*: We affirmed the defendant's conviction and sentence where the trial court did not abuse its discretion when it admitted evidence of other crimes, and the defendant forfeited review of his argument that the trial court erred in allowing evidence of a statement by the victim to an emergency department physician by inviting the error.

¶ 2 The defendant, Charlie Booker, appeals from the judgment of the Circuit Court of Cook

County finding him guilty of two counts of aggravated criminal sexual assault (720 ILCS 5/11-

1.30(a)(3) (West 2018)) and sentencing him to an aggregate term of 35 years' incarceration. On appeal, the defendant contends that the trial court abused its discretion when it admitted evidence of other crimes committed by the defendant in Memphis, Tennessee, three months after the alleged conduct in this case, and that the trial court abused its discretion when it allowed a physician to testify regarding statements the victim made in an emergency room when she sought treatment following the alleged sexual assault. For the reasons that follow, we affirm.

¶ 3       The defendant was charged in a 19-count indictment with, *inter alia*, aggravated criminal sexual assault (penis to mouth) (720 ILCS 5/11-1.30(a)(3) (West 2018)), aggravated criminal sexual assault (penis to sex organ) (720 ILCS 5/11-1.30(a)(3) (West 2018)), and aggravated battery (strangling) (720 ILCS 5/12-3.05(a)(5) (West 2018)). The State elected not to proceed on the remaining 16 counts. Following a jury trial, during which he appeared *pro se*, the defendant was found guilty of two counts of aggravated criminal sexual assault and one count of aggravated battery. Counsel was appointed to assist the defendant with post-trial motions and filed a motion for a new trial. That motion was denied, and the trial court entered judgment on the aggravated criminal sexual assault charges and sentenced the defendant to two 17½-year terms of imprisonment for an aggregate term of 35 years. The trial court vacated the aggravated battery count "deeming" it the force used in the other two offenses. The defendant moved to reconsider his sentence and the trial court denied the motion. This appeal follows.

¶ 4       The following facts are taken from the report of proceedings and common law record. On May 2, 2019, the grand jury returned an indictment charging the defendant with, among other things, two counts of aggravated criminal sexual assault. The defendant was initially represented by a public defender but elected to proceed *pro se* and demand trial.

¶ 5    Before trial, the State moved to admit evidence of other crimes arguing that the evidence would demonstrate the defendant's propensity to commit sex crimes and lack of consent. The State alleged that the defendant had been involved in two additional sexual assaults, one in Chicago and one in Memphis. On December 9, 2019, the trial court held a hearing on the State's motion. After describing the expected evidence, the State argued that the assaults were similar because: they all involved African American women in their twenties; the assaults occurred between midnight and 4:30 am; the defendant lured the women to a secluded area using false pretenses; he vaginally and orally raped all three women using a threat of force; and, in the case being tried and in the Memphis case, the defendant actually used force. The State further argued that in the Memphis case and the case being tried, the defendant stole the victims' belongings and drove away from the scene.

¶ 6    The defendant responded arguing that the Memphis case should not be used because although there was an outstanding warrant for his arrest "[t]here's not no official charge."

¶ 7    After hearing the parties' arguments, the trial court ruled that the other crimes evidence would be admitted, finding that it was relevant to show propensity, identification, and a lack of consent.

¶ 8    At trial, C.C. testified that she was 24 years old, and had two young children. C.C. testified that in April 2018, she lost her job and was unsuccessfully looking for work. After speaking with a friend, she decided to try prostitution to earn some money. On April 19, 2018, C.C. and two other women went to the west side of Chicago. C.C. had two "dates" that "went well." During each date she met a man who paid her for sexual acts. C.C. placed half of the money she received in her pocket and half in her boot.

¶ 9    At approximately 4:30 a.m., a man, identified as the defendant, pulled up in a car. They spoke and C.C. agreed to give the defendant oral sex in exchange for $60. C.C. got into the defendant's car, and they drove "out of the league," further from the spot where he picked her up than C.C. felt comfortable with. The defendant parked in an alley. C.C. told the defendant that she did not feel comfortable because it was too dark. The defendant circled the block but returned to the same alley. He did not, however, pull as far into the alley.

¶ 10    C.C. tried to give the defendant oral sex in the front seat but decided the car was too small and got into the back seat. The defendant got out, walked to the back, and got back into the car. As C.C. turned toward the defendant to perform oral sex on him, he put his hands around her neck, and began squeezing. C.C. had trouble breathing and felt helpless and scared. The defendant told C.C. to do what he told her, or he would hurt her. C.C. told the defendant that it was not necessary because she was already out doing anything for money. C.C. reached for the door handle, but the defendant tightened his grip on her neck and repeated his warning that if she did not comply, he would hurt her.

¶ 11    C.C. told the defendant that she would do whatever he wanted if he would just let her go. The defendant told her to turn around and put his penis in her mouth. When C.C. would not do so voluntarily, the defendant forced his penis into her mouth. The defendant placed one hand on C.C.'s head and one hand on her neck and forced her to move her head giving him oral sex. The defendant asked C.C. to take her pants off, and she complied because she "had to." The defendant inserted his penis into her vagina from behind. The defendant was not wearing a condom. C.C. was crying and tried to look at the defendant "so that he could see the hurt." The defendant told her not to look at him and continued assaulting her until he ejaculated.

¶ 12    After the defendant finished assaulting C.C., he asked her what she had on her, how much money she had made. She told him that she had a phone, money, and a benefits card. The defendant went through her pockets and took those items. The defendant also took the money she had in her boot. The defendant told C.C. to crawl out of the car and not move until he drove away. C.C. was only wearing one boot at this time; the defendant kept her other boot and belongings with him as he drove away. C.C. got up and began running until she reached a gas station. There she asked to borrow a stranger's phone and called her "mom-in-law," Laskieuse Whiting, the grandmother of one of her children. C.C. told Whiting that she had been raped and asked her to meet her. C.C. was taken to Rush Hospital, and Whiting met her there.

¶ 13    At the hospital, C.C. did not tell the first nurse she met that she had been working as a prostitute because "I would be ashamed of what they would think and that they wouldn't believe me." C.C. told that nurse that she was hanging with someone and that he took advantage of her. C.C. admitted that that statement was not true. After Whiting arrived, she told C.C. she had to tell the truth, and C.C. told the medical personnel "what really happened." A doctor examined her, performed a "rape kit," and prescribed medications.

¶ 14    A male police officer arrived, but C.C. did not speak to him because she felt more comfortable speaking with a female officer. A female police officer arrived, and C.C. spoke to her, and later to detectives. In March 2019, she identified the defendant from a photo array.

¶ 15    Laskieuse Whiting testified that C.C. was the mother of one of her grandchildren. On April 20, 2018, at approximately 4 a.m., she received a call from C.C. on a number she did not recognize. C.C. told Whiting that she had been raped and was at a gas station near the expressway. Whiting

started to go to the gas station but received another phone call from C.C. telling her to go to Rush Hospital.

¶ 16    At the hospital, Whiting saw C.C. lying on a bed in a treatment room. A nurse was with her. C.C. was balled up on the bed and crying. A female police officer arrived and spoke to C.C. with Whiting in the room. Whiting left while C.C. was still speaking with the police officer.

¶ 17    Clare Elfayer, a Chicago police officer, testified that at approximately 6 a.m. on April 20, 2018, she was dispatched to Rush Hospital because the victim in a crime was requesting a female officer. She met C.C. at the hospital. C.C. was in bed, curled in a fetal position, and had a blanket pulled up over her face. C.C. reported that she had been raped and robbed of an iPhone. Elfayer took the details of the incident, notified detectives, and ensured that a "rape kit" was completed by the hospital.

¶ 18    Dr. Sobia Ansari testified that she is an emergency department physician at Rush University Hospital. On April 20, 2018, she treated C.C. The State requested that Dr. Ansari be allowed to refer to her notes during her testimony. Defendant objected, and the trial court overruled his objection. Dr. Ansari testified that she recorded a summary of what C.C. told her in her medical records. Dr. Ansari testified that C.C. told her:

> "She was picked up by a man in a green car. They drove for about six minutes. After they stopped, they both got into the back of the car. He started to choke her. She told him he could take her money and belongings in order to avoid getting hurt. He forced her to have vaginal intercourse, then oral intercourse, then vaginal intercourse again. He was not wearing a condom. His penis touched her anus but did not penetrate her anus. She does not think he ejaculated in her vagina or mouth. He tried to choke her a second time. She did not pass out.

He pulled her from the car, told her to get on her knees, to face the other direction, and then he drove away."

Dr. Ansari testified that knowing what happened to C.C. was important in order to give her proper medical care.

¶ 19    Dr. Ansari further testified that she examined C.C. and performed a criminal sexual assault kit on her. During the examination, Dr. Ansari noticed red marks on both sides of C.C's neck. She testified that the marks were consistent with C.C.'s report of being strangled. Dr. Ansari noted injuries to C.C.'s genitalia, redness and bleeding around the os, the opening to the uterus. Dr. Ansari used swabs to collect samples from C.C.'s vagina, anus, and mouth for a criminal sexual assault kit.

¶ 20    During cross examination, the defendant asked to "read your report over again and tell me exactly what she–you said that she stated to you." Dr. Ansari complied and read the statement again. The defendant asked several more questions about the statement.

¶ 21    The State presented the testimony of several forensic scientists. They testified that the vaginal and oral swabs were tested using a technique that separates sperm cells from non-sperm cells. The non-sperm fraction of the vaginal and oral swabs yielded a DNA profile consistent with the victim's DNA. The sperm fraction of the vaginal swab revealed one distinguishable male DNA component. The sperm fraction of the oral swab indicated three individuals with at least one male DNA component, however, the DNA was not suitable for comparison because it was too low. The DNA analysis of the distinguishable male component was compared with a national database and was associated with the defendant, and with a sample collected from a criminal sexual assault kit collected in Memphis, Tennessee. A confirmatory sample was collected from the defendant and analyzed. Testing revealed that the defendant was included as a possible contributor to the DNA

collected from C.C.'s vaginal swabs and that the frequency of that genetic profile was one in 3.3 nonillion individuals. 3.3 nonillion is a 3 followed by 30 zeros, or about 440 quintillion times the population of the earth.

¶ 22    The State called A.M. as a witness to testify about conduct that occurred in Memphis. Before she testified, the trial court instructed the jury that the evidence would be received on the issue of the defendant's intent, lack of consent, potential to commit sexual assault, and considered by the jury only for the limited purpose. Defendant did not object to A.M.'s testimony at that time.

¶ 23    A.M. testified that she lived in Tennessee and worked for a company that prints W-2s and payroll checks. In July 2018, she knew the defendant by the name of L.C. On the night of July 17, 2018, she agreed to drive the defendant, his cousin, and his cousin's "baby mama" to a location in Memphis where they ran errands and "hung out." They all got out of the car. After midnight, the defendant asked A.M. to drive him to a fast-food restaurant.

¶ 24    On the way to the restaurant, the defendant stated that he needed to relieve himself. A.M. stopped by a viaduct and the defendant relieved himself in a field. She then drove him to the restaurant. When they got there, the defendant said he could not find his "pay card," and asked to go back where he had relieved himself to look for it. When they got there, the defendant got out to look for his card, and A.M. got out to smoke a cigarette. She turned around and the defendant was pointing a handgun at her head.

¶ 25    The defendant told A.M. to take off her clothes. She complied, and he took her by the arm, picked up her clothes, and told her to walk into the field. In the field, he made her get on the ground. The defendant held the gun against her head and made her perform oral sex. The defendant then ordered A.M. to turn around and get on her knees. The defendant forced his penis into her anus and

then told her to flip over and forced his penis into her vagina. He kept the gun pointed at her while he assaulted her. After penetrating her vagina, the defendant told A.M. to flip over and placed his penis in her mouth again. He then ordered her to turn over and penetrated her anus again. The defendant repeated the cycle penetrating A.M. orally, anally, and vaginally.

¶ 26    The defendant told A.M. that if she told anyone what had happened, he would kill her family. He also asked if A.M. had any cash. She told him that she only had a food stamp card. The defendant told A.M. to get dressed and then told her to lie on the ground again and wait until she heard the car pull away. The defendant never left, and A.M. turned to look at him. The defendant said, "I'm sorry" and fired a shot at her. The bullet went through her left wrist. A.M. pushed the defendant and ran across the field toward some houses. The defendant followed her. As he ran towards her, he fired five more shots. One shot struck A.M. in the chin and another in the right arm. The defendant ran back to A.M.'s car and drove away. A.M. banged on doors, but no one answered. Eventually emergency medical personnel arrived and took her to a hospital.

¶ 27    At the hospital, A.M. was treated for her wounds and a criminal sexual assault kit was collected. In addition to her car, the defendant also left with A.M.'s phone, identification, food stamp card, and purse. A.M. later learned that her car was recovered in Illinois.

¶ 28    The State rested, and the defendant rested without testifying or presenting evidence.

¶ 29    During a discussion of the jury instructions, defendant objected to an instruction regarding A.M.'s testimony saying, "I object to that *** because clearly this is a crime, an alleged crime that happened after a crime I was charged with and other crimes used should be crimes that was previously alleged done than something that happened after a crime was committed."

¶ 30    Following closing arguments, the trial court instructed the jury. The jury found the defendant guilty of two counts of aggravated criminal sexual assault and one count of aggravated battery. The case was continued several times while the defendant alternatively requested the assistance of counsel and requested to proceed *pro se*. Ultimately, counsel was appointed for defendant and filed a posttrial motion alleging various errors including, an allegation that the court erred in allowing the State to present evidence of other crimes, specifically the sexual assault on A.M., and that the trial court erred when it allowed Dr. Ansari to testify regarding C.C.'s statements to her regarding the sexual assault. The trial court denied the motion for a new trial and, after a hearing, sentenced the defendant to two consecutive terms of 17½ years for each aggravated criminal sexual assault conviction and vacated the conviction for aggravated battery. The defendant moved to reconsider the sentence and the trial court denied the motion. This appeal follows.

¶ 31    The defendant first contends that the trial court abused its discretion when it allowed evidence of other crimes committed in Memphis. The State responds that the defendant waived this error by failing to object on the same grounds argued on appeal. In reply, the defendant argues that the error was not waived and that, if waived, it should be considered as plain error.

¶ 32    Generally, to preserve an error for review, a defendant must object to the error at trial and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. Failure to do either results in forfeiture. *Id.* In criminal cases where the admissibility of evidence has been litigated in a motion *in limine*, a contemporaneous trial objection is not required. *People v. Denson*, 2014 IL 116231, ¶ 18. A specific objection at trial forfeits all grounds not specified. *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009). However, the issue raised by a defendant on appeal need not be identical to

the issue raised at trial, and we will not find that a claim has been forfeited when it is clear that the trial court had the opportunity to review the same essential claim. *Id.*

¶ 33   In this case, the defendant responded to the State's motion *in limine*, arguing that the evidence should not be admitted because there was "no official charge." The defendant has abandoned this basis on appeal, arguing instead that the two offenses were not sufficiently similar to one another and that an examination of the legislative history requires us to conclude that only prior offenses may be considered. We find that these arguments have no connection to the limited basis raised by the defendant during the State's motion *in limine*. We note that the defendant raised his objection based on the timing of the offense during the conference on the jury instructions. However, this untimely objection gave the trial court no opportunity to review the issue before allowing the testimony. Therefore, we conclude that the arguments have been forfeited. See *Lovejoy*, 235 Ill. 2d at 148. The defendant, however, alternatively urges us to consider the arguments under the second prong of the plain-error doctrine.

¶ 34   Even where a defendant has forfeited an error it may still be considered under the plain-error doctrine. *In re N.H.*, 2016 IL App (1st) 152504, ¶ 74. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615 (eff. Jan 1, 1967).

> "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the

fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step in the plain-error analysis is to determine whether an error occurred. *Id.*

¶ 35    The defendant raises two arguments regarding the admission of other crimes, evidence. First, he argues that the trial court abused its discretion because there was a lack of similarity, and the details far exceeded any legitimate purpose. Second, he argues that the statute is ambiguous and should be construed to allow only evidence of prior conduct. We address each argument in turn.

¶ 36    Under the common law rules in Illinois, evidence of other crimes was inadmissible to show a defendant's propensity for criminal behavior. See, *e.g.*, *People v. Richee*, 355 Ill. App. 3d 43, 50-51 (2005). Section 115-7.3 of the Code of Criminal Procedure (725 ILCS 5/115-7.3 (West 2018)), however, provides an exception to this rule for defendants accused of certain—primarily sexually motivated—offenses, including aggravated criminal sexual assault. 725 ILCS 5/115-7.3(a)(1) (West 2018). Subsection (b) reads:

> "If the defendant is accused of an offense set forth in paragraph (1) or (2) of subsection (a) or the defendant is tried or retried for any of the offenses set forth in paragraph (3) of subsection (a), evidence of the defendant's commission of another offense or offenses set forth in paragraph (1), (2), or (3) of subsection (a), or evidence to rebut that proof or an inference from that proof, may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(b) (West 2018).

The key issue is whether the probative value of the evidence is substantially outweighed by its prejudicial effect. See *People v. Donoho*, 204 Ill. 2d 159, 182–83 (2003). Section 115-7.3 specifies that a trial court should consider the following in making that determination:

"(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2018).

We review the trial court's determination for an abuse of discretion. *Donoho*, 204 Ill. 2d at 182. An evidentiary ruling constitutes an abuse of discretion only when it is arbitrary, fanciful, or unreasonable. *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 27.

¶ 37   Here, we find no abuse of discretion. First, the proximity in time was close; A.M. testified that the defendant assaulted her approximately three months after he allegedly assaulted C.C. Second, there was a high degree of similarity between the two offenses. In both cases, the victim was a young woman whom the defendant did not know or had known for only a short period of time. In both cases, a car was used to place the victim in a secluded area. In each case, the defendant used false pretenses to lure the victim to the scene of the crime. C.C. falsely believed that she was being taken to the alley for an act of prostitution. A.M. falsely believed that the defendant needed to return to the field to look for a lost card. The defendant used force or a threat of force to compel compliance with his sexual demands in both cases. In both crimes, the defendant assaulted the victim orally and vaginally. In both cases, the defendant took the victims' money and personal property after the sexual assault. After the defendant completed his assaults, he told the victim in each case to kneel or lie on the ground while he made his escape in a car. Given the proximity in time and degree of similarity between the offenses, we cannot conclude that the trial court abused its discretion.

¶ 38    The defendant argues that this case is similar to *People v. Johnson*, 406 Ill. App. 3d 805 (2010), and urges us to find the differences between the two offenses "stark." We disagree. In *Johnson*, this court found "telling differences" between the charged and uncharged offenses where one offense involved two attackers and the other a solo attack, one offense involved a car and the other did not, and in only one case the attacker gave the victim alcohol and blew cocaine in her face. *Id.* at 811. However, the differences here are not so stark. Although only one offense involved prostitution, both offenses involved young women who had only recently met the defendant. The length of the assault differed in each case, but we do not find this a significant difference, in light of the fact that both occurred in the early hours of the morning. Although one offense occurred in a car in an alley while the other occurred in a field, both involved using a car to take the victim to a secluded area. Finally, although only the attack on A.M. involved the use of a firearm, both offenses involved the use of force. Having carefully reviewed the record in this case, we find no support for the defendant's contention that the trial court "ignored" the differences between the two cases when weighing the probative value against the possibility of undue prejudice.

¶ 39    The defendant also argues that the offenses committed against A.M. were more heinous than the ones committed against C.C. and, therefore, the jury was likely to convict based upon the other sex crime evidence. See *People v. Smith*, 406 Ill. App. 3d 747 (2010). We find the defendant's reliance on *Smith* misplaced. First, and very significantly, *Smith* involved an appeal by the State where the trial court had barred the other crimes evidence. Accordingly, the burden was on the State to show an abuse of discretion. *Id.* at 751. Moreover, the other crimes evidence barred in *Smith* occurred 25 to 40 years before the charged offense and involved no less than five other victims. *Id.* at 753. This is dissimilar to the case at bar which involved only a single additional victim and where

the two assaults occurred within a few months of each other. Accordingly, we find that *Smith* warrants no further discussion.

¶ 40    The defendant argues that the other crimes evidence went beyond what was necessary to illuminate the issue of identity. The defendant argues that he "acknowledged" the sexual encounter with C.C. It is unclear what the defendant means by acknowledging the encounter, since he never filed an answer to the State's discovery request identifying his defense and did not testify. However, even assuming, *arguendo*, that the defendant acknowledged the encounter, the issue of consent remained. C.C. admitted that she was engaged in prostitution when she encountered the defendant. Evidence that the defendant engaged in a similar attack on another woman was relevant to demonstrate C.C.'s lack of consent. Moreover, we find no abuse of discretion where the trial court limited the evidence of the other encounter to a single witness, and her testimony was relevant to issues in the case. A.M.'s testimony regarding the length of the encounter and the force used during the encounter were relevant to establish her lack of consent and by implication the propensity of the defendant to use force to overcome resistance in his victims. Therefore, we find no abuse of discretion in the trial court's admission of this evidence.

¶ 41    The defendant also argues that the trial court erred, as a matter of law, because the statute only allows the admission of prior offenses to show propensity, and the assault of A.M. occurred subsequent to the assault on C.C. The defendant urges us to consider the legislative history, arguing that the statute is ambiguous. We disagree.

¶ 42    The primary objective of statutory construction is to ascertain and give effect to the legislature's intent. *People v. Jurisec*, 199 Ill. 2d 108, 118 (2002). The best indicator of the legislative intent is the language of the statute. *Id.* Where intent can be ascertained from the plain

language of the statute, it will be given effect without resorting to other aids for construction. *People v. Lemons*, 191 Ill. 2d 155, 159 (2000). Statutory construction is a matter of law that we review *de novo*. *People v. Smith*, 2014 IL 115946, ¶ 21.

¶ 43    Here, we find no ambiguity in the statute. The plain language of section 115-7.3 reads "another offense or offenses." The statue contains no temporal element saying neither "prior," nor "subsequent." We find no ambiguity requiring interpretation, and therefore, there is no need to look at the legislative history as the defendant suggests. Accordingly, we find that the trial court did not err when it allowed other crimes evidence, simply because that evidence involved conduct occurring after the charged offense.

¶ 44    Having carefully considered all of the defendant's arguments regarding other crimes evidence, we conclude that the trial court neither erred in its interpretation of the statute nor abused its discretion in its application of that law to the facts of this case. Because there was no error there can be no plain error. See *People v. Ali*, 2019 IL App (2d) 161016, ¶ 13.

¶ 45    Next, the defendant contends that the trial court erred when it allowed Dr. Ansari to read, in its entirety, the statement given to her by C.C. The defendant argues that he preserved this error by objecting at the trial level. The State, on the other hand, argues that the defendant not only failed to raise this specific objection but invited the error when he asked the doctor to read the statement again. We agree with the State.

¶ 46    As we observed above, a specific objection at trial forfeits all grounds not specified. *Lovejoy*, 235 Ill. 2d at 148. At trial, the defendant objected only to the fact that Dr. Ansari was using her notes to aid her recollection. We find the defendant's contentions on appeal that he objected on any other basis unfounded and unsupported by the record. Moreover, we find that the defendant invited the

error he complains of. Invited error, or acquiescence, is a procedural default sometimes described as estoppel. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). "Simply stated, a party cannot complain of error which that party induced the court to make or to which that party consented." *Id.* In this case, the defendant did not merely fail to object when the State asked Dr. Ansari to read the statement, he asked her to read it again during cross-examination. Accordingly, we find that this is invited error and that the defendant has forfeited review on appeal.

¶ 47    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 48    Affirmed.