2020 IL App (1st) 19-0346-U

No. 1-19-0346

Order filed March 13, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In Re* KEON F., a Minor, | ) | Appeal from the |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| v. | ) | No. 17 JD 87 |
| | ) | |
| KEON F., | ) | Honorable |
| | ) | Stuart F. Lubin, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HALL delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1   *Held*: Respondent's adjudication of delinquency for first degree murder and personally discharging a firearm during the commission of an offense is affirmed over his contentions that: the introduction of prior statements of the State's eyewitnesses and the State's use of those statements in closing argument substantially prejudiced him and denied him a fair trial; and the State used his post-arrest silence in violation of his right to a fair trial. Respondent's order of commitment should be corrected to reflect a single conviction and sentence for first degree murder where there was only one death.

¶ 2     This is an expedited appeal under the provisions of Illinois Supreme Court Rule 311(a) (eff. July 1, 2018).

¶ 3     Following a jury trial, the minor respondent Keon F. (K.F.), was adjudicated delinquent for first-degree murder and for personally discharging a firearm during the commission of the offense.  Respondent was sentenced to commitment in the Department of Juvenile Justice until he reached the age of 21 years old, and a suspended Extended Juvenile Jurisdiction (EJJ) was allowed. If respondent completes his juvenile sentencing successfully, he will not be required to complete an additional adult sentence of 23 years for first degree murder and a mandatory 25-year firearm enhancement.

¶ 4     On appeal, respondent contends that: (1) the introduction of inadmissible prior statements of the State's key eyewitnesses, and the State's substantive use of these statements in closing argument substantially prejudiced him and denied him a fair trial where the State presented no physical evidence connecting him to the offense, and his trial was ultimately a credibility contest between the State's eyewitnesses and his alibi witnesses; (2) the State's examination of Detective James DeCicco, which inaccurately implied that respondent made a statement to the police, and DeCicco's response that respondent had not told him that he had an alibi for the time of the offense was an impermissible use of respondent's post-arrest silence and violated his right to a fair trial; and (3) the order of commitment should be corrected to reflect a single conviction and sentence for first degree murder where there was only one death.  For the following reasons, we affirm respondent's adjudication of delinquency.

¶ 5                              I.  BACKGROUND

¶ 6     A petition for adjudication of wardship was brought against 15-year old respondent, K.F., a minor, for first degree murder and personally discharging a firearm during the commission of an

offense.  The charges stemmed from the June 17, 2015, shooting death of 15-year old, Kimon Wheeler.  Respondent was arrested and charged as an adult but was transferred back to juvenile court for a discretionary transfer hearing.  The trial court ruled that the case would remain in juvenile court and granted the State's motion to designate the proceedings as an EJJ.  The following testimony was taken at trial.

¶ 7                              A.  The State's Case-in-Chief

¶ 8                                   1.  Nigel Taylor

¶ 9      On direct examination, Nigel Taylor testified that on the night of the shooting, he was 18 years old. He was "hanging out" on the corner of Cullerton and Keeler for a few hours with friends, Kenterious Greer, Montreal Solomon, Jawon Ward, Kimon, and a few young ladies. Nigel testified that at approximately 10:50 p.m., respondent, who Nigel identified in court, approached the group alone. Nigel testified that he did not know respondent prior to that incident and that he did not recall knowing him by any nicknames.  When respondent walked up to the group, he raised a gun, pointed it at Kimon, and Nigel "went the other way."  Nigel testified that he did not hear respondent say anything.  Nigel testified that while he was running, he heard about two gunshots.  When the gunshots stopped, Nigel returned to the scene and saw Kimon "laying there, taking his last breath." Nigel left the scene before the police arrived.

¶ 10     Nigel testified that the police picked him up the next day and took him to the police station where he spoke with two police officers about what transpired the day before. After being presented with exhibits of several Photo Live Lineup Advisory Forms (photo advisory form) Nigel testified in court that he recalled signing a photo array in which he identified respondent.  He also testified that he recalled signing a photo array identifying the person who walked up to the group with respondent (Aaron) but that he did not know his name.

¶ 11    Nigel initially testified that he did not meet with Assistant States Attorney (ASA) Leanna Miehlich. Then he testified that he did not recall meeting with ASA Miehlich. After further questioning, he also testified that he did recall meeting with ASA Miehlich and Detective David March later that day, and agreed to have his statement videotaped at approximately 11:00 p.m. Nigel was asked whether he stated during that videotaped statement that respondent was with two other people when he approached the group, Nigel responded, "I don't recall." The State then confronted Nigel with his prior videotaped statement in which he stated that he recalled being asked certain questions but did not recall giving all of the answers.

¶ 12    During his videotaped statement, Nigel stated that: when respondent walked up to the group with two other individuals, he pulled out a gun and said, "nobody move;" Nigel identified respondent and Aaron in a photo array; respondent initially pointed the gun at another individual in the group pointing it at Kimon; and, he knew respondent as "Little Black."

¶ 13    Respondent's attorney did not object to the use of Nigel's prior statement.

¶ 14                                    2.  Gjuana Garmon

¶ 15    On direct examination, Gjuana testified that on June 17, 2015, she was 16 years old. On that evening, she was on the corner of Cullerton and Keeler with her friends "TT," Robin, Jazmine Jordan, Kenneth, Myesha and Kimon. Three boys walked up to the group, "Little Aaron," respondent and another person. She stated that she knew Little Aaron since grammar school, and he dated her cousin. She knew respondent as "Little Black," had seen him at the youth center playing basketball with his friends and stated that respondent "was no bad person."

¶ 16    Gjuana testified that when the three people first walked up, they were asking questions and talking about shooting dice. She began to walk away and when she turned back around, there were

one or two gunshots, but she did not know who was shooting. She saw Kimon swing around and fall to the ground.

¶ 17    Gjuana testified that she was present when the ambulance and police arrived, and the police asked her and a friend if they saw anything. She testified that the police gave her a phone and she showed the police two pictures of Aaron from Facebook.

¶ 18    Gjuana was then questioned by the State regarding her prior identification of respondent during a meeting with a detective at the police station, to which she responded that she did remember the photo array, but subsequently stated that she did not. She also stated that she did not recall making an identification. Gjuana was then shown several other exhibits, a photo advisory form and a photo array, and asked if she recognized them, to which she responded, "yes."

¶ 19    Gjuana testified that on June 19, she and her mother met with ASA Miehlich and Detective March and gave the ASA a summary of what occurred on the night of the shooting. When asked whether she told ASA Miehlich that she knew respondent, she responded, "That's false."

¶ 20    Gjuana testified that she agreed to have her statement videotaped and the State confronted her with her statement. During her videotaped statement, Gjuana indicated that she went to the store with her friends after school, including Kimon. Respondent, who she knew as Keon and "Little Black," and Aaron - "Little Aaron" - and another individual approached the group and started walking around. She identified both from a photo array presented to her at the police station. Respondent began talking to an individual in the group, Jawon, about their gang affiliations and asked if he wanted to play dice. Respondent started to walk away, but then turned around and said, "Don't anybody move" and pulled out a gun. Jawon was the first person to run and Gjuana began to walk away slowly. Kimon started to move a little, she heard gunshots and respondent shot Kimon and ran.

¶ 21    Her statement indicated that she ran towards Kimon and screamed for someone to call an ambulance. She was there when the police arrived on the scene and spoke with Detective March after Kimon's body was taken away. At this time, defense counsel objected to her testimony as hearsay and the court overruled the objection.

¶ 22    Gjuana's statement further indicated that she told the detective what happened and showed him two faces on her own phone of the individual who shot Kimon as respondent and the person he was with, Aaron.  She told the detective that the shooter was "Little Black" and that his real name was Keon F. and also gave the detective respondent's Facebook name. She knew respondent because she would see him at a youth center, and she knew Aaron from the neighborhood.

¶ 23    The State then asked Gjuana if she recalled testifying before a grand jury on July 8, 2015, to which she responded, "I don't remember."  The prosecutor then showed her photos that she previously identified during her grand jury testimony.  Although she recognized her signature on some of the photos, she did not recognize her signature on others and indicated that she could not recall whether she had signed them "in blue." Defense counsel did not conduct a cross-examination of Gjuana.

¶ 24                                    3.  Jazmine Jordan

¶ 25    Jazmine Jordan testified that on June 17, 2015, she was hanging out in front of a house at Cullerton and Keeler at approximately 11:00 p.m. with her brother and approximately 15 other people, including Kimon, Montreal, Jawon and Gjuana. Three boys approached the group and started asking questions. Jazmine stated that she did not know the three boys, nor had she seen them previously.  Jazmine then identified a photo array in which she previously signed and circled Aaron's and respondent's photos.

¶ 26    Jazmine testified that the three boys started arguing with the other people and respondent pulled out a gun.  The crowd began to walk and run, and respondent said, "don't run now" and then he fired twice before running.   Kimon tried to run but fell.  After trying to get up, Kimon fell again and never got up.  Jazmine was at the scene when the police and ambulance arrived, and she gave her name and number to the police officer.

¶ 27    The police officer called Jazmine the next day and she went to the police station with her mother.  Jazmine testified that she agreed to identify some photos but refused to be videotaped. Jazmine identified the photo advisory forms she signed, related to respondent and Aaron.  Jazmine then agreed to provide a videotaped recording. She also identified respondent in court.

¶ 28                                      4. Kenterious Greer

¶ 29    On direct examination, Kenterious Greer testified that he had a contempt of court case pending because he was served with a subpoena to testify in this case on a prior date and did not appear.  Kenterious stated that on June 17, 2015, at approximately 11:00 p.m., he was on the corner of Cullerton and Keeler with approximately 20 other people, including Jawon, Jazmine and Kimon. Three people approached the group and asked, "what we was?" One person he knew as "Aaron", whom he had not known for long.  After someone responded, respondent showed a gun and said, "don't move." Someone made a move, Kenterious heard two shots fired and he began to run.  When he turned around and went back, he saw Kimon on the ground on the sidewalk, laying on his side and there were people around him trying to help him breath.

¶ 30    Kenterious testified that the next day the police came to his home and took him to the police station where he was asked to sign photo advisory forms and view photo arrays related to respondent and Aaron, which he authenticated in court.  On the form related to respondent was written "HE SHOT HIM" and respondent's picture was circled.  On the form related to Aaron,

was written, "HE WAS THERE WITH HIM" and Aaron's picture was circled. Kenterious also provided a recorded statement but he did not want to be videotaped because he was scared. He identified respondent in the courtroom as the shooter.

¶ 31    During cross examination, Kenterious testified that the other person that approached the group on the night of the shooting was a black male with "dreads" but stated that he did not recall what he looked like because it was dark. He stated that when the shots were fired, he was running away and that he did not see when Kimon was shot.

¶ 32    On redirect, Kenterious stated that he recognized respondent in court because of his face and the dreads and that respondent was the person that pulled out the gun.

¶ 33                                    5.  Jawon Ward

¶ 34    On direct examination, Jawon Ward testified that he had a contempt of court case pending because he was served with a subpoena to testify in this case on a prior date and did not appear. Jawon stated that on June 17, 2015, at approximately 11:00 p.m., he was on the corner of Cullerton and Keeler with friends and family members, including Montreal, Kimon, Jazmine and Kenterious. He was 11 or 12 years old. Jawon testified that Kimon was his cousin and he had known him all his life.

¶ 35    While they were standing on the corner, three people approached the group. Jawon identified one of the people in court as respondent. Jawon testified that he had seen respondent a few days prior, but he did not know who he was. Respondent's nickname was "Little Black." Respondent asked, "what we was" and Jawon responded "1900 Kolin." They continued to talk for a few minutes in the middle of the street when respondent, pulled out a gun. Jawon ran towards the alley when respondent took out the gun and did not see anything else, but he heard gunshots. After the gunshots ended, he ran back to the corner and saw Kimon laying on the ground.

¶ 36 In court, Jawon identified three photo advisory forms he signed and three photo arrays he viewed when he was taken to the police station. On the first form he marked, "HE WAS THE SHOOTER," and identified respondent in the photo array. The second form and photo array identified Aaron as the person with respondent on the night of the shooting. On the third form he marked, "THAT'S LITTLE MAN THAT WHAT THEY CALL HIM. HE WAS THERE WITH THEM," and identified the person in the corresponding photo array as the third person who came to the corner on the night of the shooting as "Little Man," with the name "Joi Davis" written on the photo.

¶ 37 Jawon testified that he did not see anyone else with a gun that evening.

¶ 38 On cross-examination, Jawon testified that he was able to identify respondent because he had seen him a few days prior. He stated that he had his back turned when the shots were fired.

¶ 39                                    6. Montreal Solomon

¶ 40 On direct examination, Montreal Solomon testified that he was serving a nine-year sentence in the Illinois Department of Corrections for attempted murder. He stated that Kimon was his cousin and stayed with him during the summer of June 2015. He testified that on June 17, 2015, he did not recall whether he was on the corner of Cullerton and Keeler; he did not remember the night Kimon was shot; he did not recall whether he went to the hospital that night; and he did not recall whether he went to the police station or who he spoke to.

¶ 41 The State then showed Montreal an exhibit of his handwritten statement and asked him to identify the document in court, which he did. Montreal stated that although it was his signature, he did not recall signing it. Montreal also identified a photo advisory form and a photo array which he had previously signed. When directly asked whether he knew respondent or Aaron, Montreal responded, "no."

¶ 42    When Montreal was recalled to the witness stand, he was asked whether he had testified before a grand jury on July 1, 2015, and he stated that he did not recall.

¶ 43                           7.  Detective Jorge Lopez

¶ 44    Detective Lopez testified that on June 17, at approximately 11:45 p.m., he was assigned to the area of 4155 West Cullerton.  When he arrived at the scene at approximately 12:20 a.m. on June 18, three other detectives were already present.  He observed three spent shell casings on the sidewalk near the store on the northeast corner and two shell casings on the street. A little east of Cullerton, he observed a vest, white t-shirt, baseball cap and a spot with blood.

¶ 45    Later that evening, he spoke with Jazmine, Nigel and Kenterious separately.  Each of them provided him with a summary of what occurred, and he asked each of them to view a photo array with an independent administrator.  The photo arrays were created by another detective with him present.  A lineup identification was not conducted because respondent was not yet in custody.

¶ 46    On June 19, 2015, at approximately 7:10 p.m., Detective Lopez learned that respondent was in custody.  The following day, he learned that Aaron and Joi were also in custody.

¶ 47                           8.  Detective James DeCicco

¶ 48    On direct examination, Detective DeCicco testified that on June 17, 2015, he received an assignment just before midnight to go to the intersection of Cullerton and Keeler. He spoke to others on the scene and he and his partner went to Mt. Sinai Hospital.  After speaking with a Sergeant at the hospital, he transported Jawon and Montreal to the police station where he asked Detective Graves to conduct four photo arrays.  On June 19, he located Montreal again and took him to the police station and took a statement from him with an ASA present.  On June 20, 2015, another photo array was conducted with Jawon.

¶ 49    Detective DeCicco testified that respondent's mother, Tamika Murphy, never told him that respondent was with her on June 17 at 10:55 p.m.

¶ 50    On cross examination, Detective DeCicco initially testified that he did not recall being told by Ms. Murphy that respondent was with her at 10:00 p.m. on June 17, 2015. After hearing the videotape of the interview, Detective DeCicco acknowledged that Ms. Murphy did tell him respondent was home, but he did not recall her telling him what time. Detective DeCicco testified that neither he nor any fellow officers completed a police report or handwritten notes, nor did they ever ask Ms. Murphy to give a videotaped statement. Although he was in constant communication with the ASA's office regarding the progress of the investigation, he never informed the ASA's office that respondent's mother informed him that respondent was home with her on the night of June 17, 2015. Detective DeCicco never asked Ms. Murphy who else was home with them that evening or what time she first and last saw respondent on that date. He also testified that he never investigated respondent's alibi and to his knowledge, no one from the police department ever did.

¶ 51                            9. ASA Marilyn Salas-Wail

¶ 52    On direct examination, ASA Salas-Wail testified that on June 19, 2015, she met with Montreal with Detective DeCicco present for approximately 15 to 20 minutes. Over defense counsel's hearsay objection, ASA Salas-Wail testified that Montreal agreed to provide a written statement and she read Montreal's entire statement to the jury. The statement indicated in relevant part that on June 17, 2015, Montreal and his cousin, Kimon, were on their way home when they saw 10 to 15 people they knew on the corner of Cullerton and Keeler in front of a corner store and started talking with them. It was dark but there were streetlights in front of the store.

¶ 53    After approximately three minutes, three individuals who he did not know walked up to the group. Montreal was able to identify two of the individuals from a photo array as respondent,

"Little Black," and also identified the person who was with respondent but did not know his name. Respondent asked what they were doing there and started arguing with some of the ladies.

¶ 54    Then, respondent pulled out a gun, told the person next to him (Aaron) that he was going to rob them and told them not to move. Everyone started running.

¶ 55    In his statement, Montreal indicated that as he was standing on Kimon's right side and Little Black was in front of them, respondent shot Kimon. Montreal's statement indicated that the gun was black with a wooden handle and that when he heard the shot, he saw a flash. Respondent was the only person he saw with a gun. Montreal started running right after he heard the first shot and subsequently heard 3 or 4 more shots. When he turned, he saw respondent and the other person running. When he ran back to the corner where the shooting occurred, Kimon was laying on the ground across the street from the store. Montreal further stated in his written statement that while he was at the police station, he identified respondent and Aaron in a photo array.

¶ 56                    10.  ASA Leanna Miehlich

¶ 57    On direct examination, ASA Miehlich testified that on June 19, 2015, at 11:48 p.m. she took a videotaped statement of Gjuana, with her mother present, for approximately 20 minutes. Over defense counsel's objection that the statement was a prior inconsistent statement, impeaching the State's witness and foundation, the court allowed it into evidence and clips of the video were played in open court for the jury.

¶ 58    ASA Miehlich also testified that she interviewed Nigel Taylor and Jawon Ward separately.

¶ 59                    11.  ASA Enrique Abraham

¶ 60    On direct examination, ASA Abraham testified on July 1, 2015, he worked on the grand jury related to this case. Over defense counsel's objection, Montreal's grand jury statement was read at trial.

¶ 61 Montreal's grand jury testimony was largely similar to his written statement and those sections will not be repeated here. Montreal also testified to the grand jury that on the evening of the shooting, respondent "pulled the gun out" from his hip and pointed it at the group. Montreal stated that he was able to clearly see the gun, that it was black with a wooden handle and semiautomatic. Respondent told them not to run and that he was going to rob them. While he was standing next to Kimon, Little Black then pointed the gun at Kimon and shot him. Montreal stated that no one else had a gun.

¶ 62 ASA Abraham testified that he also presented Gjuana to the grand jury on July 8, 2015. Over defense counsel's objection, Gjuana's entire grand jury testimony was introduced into evidence through ASA Abraham's trial testimony.

¶ 63 After the jury heard the grand jury testimony, the court later ruled that only the prior inconsistent statements made by Gjuana were admissible. The State admitted its exhibits into evidence and rested.

¶ 64 B. Respondent's Case-in-Chief

¶ 65 Respondent then presented the following witnesses in his case-in-chief.

¶ 66 1. Brittany Levi

¶ 67 On direct examination, Brittany Levi, respondent's alibi witness, testified that respondent is her ex-boyfriend. At the time of the incident, she was 15 or 16 years old. She stated that on the night of the shooting, at approximately 10:00 p.m. she was at respondent's home with him, his mother and cousin (Damarion who was six or seven years old). Brittany testified that she spent the night at respondent's home, in respondent's bedroom and they went to his bedroom at approximately 11:00 p.m. They watched a movie and then fell asleep approximately half-way through the movie. She testified that the only time respondent left the room was when he left for

approximately three minutes to get her something to drink. When they woke up the next morning around 8:00 or 9:00 a.m., respondent was still there.

¶ 68    On cross-examination, Brittany testified that she could not recall what movie they were watching, what they were eating, what time she put the movie on or when they went to sleep because she was not watching the clock. She stated that she was not up all night and did not know whether respondent ever left the room because she was asleep. Brittany testified that she was wearing a black Nike shirt. She stated that she was up with respondent at 11:00 p.m. and that he did not leave the home. Brittany testified that she did not come forward until three years later and that she never contacted the police or respondent's attorneys.

¶ 69                                2.  Tamika Murphy

¶ 70    Ms. Murphy, respondent's mother, testified on direct examination that on June 17, 2015, at 10 p.m., she was at her apartment with Brittany, respondent, David (respondent's 17-year-old brother) and her nephew, watching television. At approximately 10:30 p.m., she began preparing for bed because she had to go to work the next morning. When she went to bed at approximately 10:55 p.m. everyone was still in the living room watching television, including respondent. She knew it was 10:55 p.m. because she looked at her cell phone prior to going bed. Her door was pushed closed but remained cracked open. She never heard her front or back door open or close. After she fell asleep, at approximately 1:00 a.m. she received a cell phone call from respondent's father wanting to speak with him. Respondent did not have a cell phone at that time. She knocked on respondent's door and noticed that respondent and Brittany were asleep in his room. She was surprised that Brittany was there because she did not know that she was going to spend the night. She woke respondent, gave him the phone and went back to her room.

¶ 71    Ms. Murphy testified that at 8:30 p.m. on June 19, 2015, she went to the police station where respondent was being held. A detective took her into a room with her son and another detective, Detective DeCicco, a white male and she told the detectives that her son was with her on the night of June 17, 2015.

¶ 72    On cross examination, Ms. Murphy testified that the distance between her apartment and the scene of the shooting is approximately two or three blocks.  After she informed the detectives that she was at home with respondent, they started talking to him.  The detectives stated, "is there anything else you wanna tell me 'cause he may not see me for a long time and is there anything that I wanted to say to him because I may not see him for a long time.  That's all - -."  She stated that she discussed her alibi with respondent's attorney when they came to her home. Ms. Murphy testified that she did not want to see anything bad happen to him.

¶ 73    On redirect examination, defense counsel played a clip from the video recording of her meeting with the detectives which she identified as true and authentic.  Ms. Murphy testified that the tape recording confirmed that she was with her son at 10 p.m. on June 17, 2015.

¶ 74    On re-cross examination, Ms. Murphy testified that she did not tell the police that respondent was at home at 10:55 p.m.

¶ 75    On redirect, Ms. Murphy testified that the detectives told her that the crime took place at around 10 p.m.  Respondent then rested.

¶ 76                                        C.  Adjudication

¶ 77    The jury found respondent guilty of first-degree murder and that during the commission of that offense, he personally discharged a firearm that proximately caused the death of another person. The jury found respondent not guilty of attempted armed robbery. Respondent was subsequently adjudicated delinquent.

¶ 78                                    D.  Sentencing

¶ 79     A sentencing hearing was held on January 3, 2019, and respondent was sentenced to commitment in the Illinois Department of Juvenile Justice until his 21st birthday. He also received an EJJ sentence of 23 years for first-degree murder and a 25-year firearm enhancement. Respondent filed a motion to reconsider his sentence which was denied. This timely appeal followed.

¶ 80                                    II. Analysis

¶ 81                    A.  Prior Statements of the State's Eyewitnesses

¶ 82                    1.  Introduction of Gjuana's Prior Statements

¶ 83     Respondent first contends that the trial court erred in allowing the State to present Gjuana's entire videotaped statement and grand jury testimony to the jury because only the portions of those statements that were inconsistent with her trial testimony were admissible, and presenting her prior consistent statements unfairly bolstered her credibility.

¶ 84     In response, the State initially contends that respondent's argument is waived. Alternatively, the State argues that the admission and use of Gjuana's prior statements was proper because she gave inconsistent testimony at trial and her prior inconsistent statements met the requirements for admission under section 115-10.1 of the Code of Criminal Procedure (Code). 725 ILCS 5/115-10.1 (West 2018). The State also argues that the trial court properly admitted Gjuana's prior inconsistent statements as substantive evidence because not only was her trial testimony inconsistent, but it was evasive and incomplete.

¶ 85      We will first address the State's argument that this issue is subject to waiver.

¶ 86     The State is correct that generally to preserve an issue for appeal, both an objection at trial and a written post-trial motion raising the issue are required. *People v. Enoch,* 122 Ill. 2d 176, 186

(1988); Ill. S. Ct. R 615(a) (eff. Jan 1, 1967). However, minor respondents need only to object at trial to preserve an issue on appeal. *In re Samantha V.*, 234 Ill. 2d 359, 368 (2009).

¶ 87    Our review of the record reveals that respondent objected to the use of Gjuana's videotaped statement and grand jury testimony during trial. During ASA Miehlich's testimony, when she attempted to read Gjuana's videotaped statement, defense counsel objected but the court overruled the objection. In addition, defense counsel objected before ASA Abraham read Gjuana's grand jury testimony into evidence. Therefore, respondent's arguments on appeal related to Gjuana's testimony are properly before us, and we turn to the merits of respondent's contentions.

¶ 88    Our review of a trial court's ruling on the admissibility of a witness' prior statement is reviewed for an abuse of discretion. *People v. Wiggins*, 2015 IL App (1st) 133033, ¶ 36.

¶ 89    Section 115–10.1 of the Code governs the use of prior inconsistent statements as substantive evidence and provides that:

> "Admissibility of Prior Inconsistent Statements. In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if:
> (a) the statement is inconsistent with his testimony at the hearing or trial, and
> (b) the witness is subject to cross-examination concerning the statement, and
> (c) the statement—
>> (1) was made under oath at a trial, hearing, or other proceeding, or
>> (2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and
>>> (A) the statement is proved to have been written or signed by the witness, or
>>> (B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or
>>> (C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording.
> Nothing in this Section shall render a prior inconsistent statement inadmissible for purposes of impeachment because such statement was not recorded or otherwise fails to meet the criteria set forth herein." 725 ILCS 5/115–10.1 (West 2018).

¶ 90    "The purpose of section 115–10.1 of the Code is to " 'protect parties from turncoat witnesses' " who, while on the stand at trial, disown a prior statement by testifying differently or professing inability to remember the subject matter. *Wiggins*, 2015 IL App (1st) 133033, ¶ 36, citing *People v. Fauber,* 266 Ill. App. 3d 381, 390–91 (1994). If the enumerated statutory conditions are met, the statute allows a witness's prior inconsistent statement to be admitted as substantive evidence. *People v. Brothers*, 2015 IL App (4th) 130644, ¶ 65.

¶ 91    In this case, the State proffered Gjuana's videotaped statement, which was taken under oath, and her grand jury testimony, which was also made under oath, both of which satisfy section 115-10.1(c)(1). 725 ILCS 5/115-10.1 (c)(1) (West 2018). In addition, Gjuana was subject to cross examination, which satisfies section 115-10.1(b). 725 ILCS 5/115-10.1 (b) (West 2018). Finally, the parties agree that significant portions of Gjuana's videotaped statement and grand jury testimony were inconsistent with her trial testimony, which satisfies section 115-10.1(a). 725 ILCS 5/115-10.1 (a) (West 2018).   Therefore, any inconsistent testimony was admissible pursuant to section 115-10.1.

¶ 92    Additionally, these inconsistent portions were critical as substantive evidence in this case. Gjuana testified at trial that she did not see respondent pull out a gun, did not show the detective a picture of respondent on the night of the shooting and that respondent only talked about shooting dice and nothing else.  She was also very evasive, inconsistent and elusive. However, during her videotaped statement and grand jury testimony, Gjuana stated that: respondent had words with Jawon about what they were doing there and his gang affiliation;  she saw respondent pull out a gun and heard him say, "don't anybody move" and "then Little Black fired the gun and Kimon got hit by the gun"; and showed the detective a picture of Aaron and respondent on Facebook. Compared to her trial testimony, her videotaped statement and grand jury testimony were

extremely detailed about what transpired on the night of the shooting and set forth significant details about statements made by respondent, Kimon and Jawon. Therefore, the introduction of these prior inconsistent statements was proper.

¶ 93    However, we do agree with respondent that the trial court erred by admitting anything other than Gjuana's inconsistent statements. "Section 115-10.1 'required * * * the trial court to determine whether the * * * statement * * * was inconsistent with [the witness's] trial testimony and to admit only those portions which were actually inconsistent.' " *Wiggins*, 2015 IL App (1st) 133033, ¶ 36 (citing *People v. Lawrence,* 268 Ill. App. 3d 327, 333 (1994)). However, this error was harmless.

¶ 94    "When determining whether an error is harmless, a reviewing court may '(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence.' " *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 26 (citing *In re Brandon P.*, 2014 IL 116653, ¶ 50).

¶ 95    We find that other properly admitted evidence overwhelmingly supported respondent's adjudication, namely, all the additional eyewitness testimony identifying respondent as the shooter. As such, Gjuana's prior consistent statements did not result in prejudice to respondent that would amount to reversible error.  Here, had Gjuana's prior consistent testimony been excluded, the testimony of five other witnesses remained in evidence to support respondent's adjudication. Nigel, Jazmine, Kenterious, Jawon and Montreal all testified consistently that respondent was present shortly before the shooting on June 17, 2015, and that they all saw respondent with a gun just before Kimon was shot. Nigel testified that respondent lifted the gun and pointed it at Kimon

shortly before hearing gunshots. In Montreal's grand jury testimony, he stated that he was standing right next to Kimon when he was shot and described the weapon that he saw respondent pull out and fire. They all testified that there were two other people with respondent and most of them testified that Aaron was one of the other people with respondent. Jawon identified the third person as Joi Davis. The vast majority of their testimonies were consistent with each other.

¶ 96    In addition, Gjuana's consistent statements did not establish any elements of the crime and were merely cumulative of other properly admitted evidence and did not contribute to respondent's adjudication. Therefore, the admission of her consistent testimony was harmless.

¶ 97    Respondent's reliance on *Wiggins* in support of his position is clearly misplaced. In fact, the *Wiggins* court specifically noted that, "The admission of a statement used to bolster the sagging credibility of a witness is reversible error when the witness' in-court testimony is crucial." *Wiggins*, 2015 IL App (1st) 133033, ¶ 41. While it is true that Gjuana's testimony was important to the case, five other people identified respondent as the person with a gun in his hand immediately before Kimon was shot and Montreal saw him pull the trigger.

¶ 98    Also notable, the *Wiggins* court concluded that in addition to the judge's errors, the evidence in that case was closely balanced. *Wiggins*, 2015 IL App (1st) 133033, ¶ 65. That is not the case here for the reasons previously stated. Therefore, respondent's argument regarding Gjuana's statements do not support reversal.

¶ 99                    2. Introduction of Nigel's Prior Statements

¶ 100   Respondent further argues that Nigel's prior statements should not have been presented to the jury because Nigel's testimony did not damage the State's case and presenting evidence of his prior consistent statements unfairly bolstered his credibility.

¶ 101   The State responds that this argument is waived because respondent did not object at trial. Alternatively, the State contends that the trial court properly admitted Nigel's prior inconsistent statements because his trial testimony was inconsistent, evasive, and incomplete.  It asserts that Nigel's prior statements were admitted substantively under section 115-10.1 of the Code, and, therefore, the only question is whether the prior statements were inconsistent with the witness's trial testimony, not whether the trial testimony affirmatively damaged the People's case.

¶ 102   We agree with the State that this argument is waived because respondent did not object at trial. *Enoch,* 122 Ill. 2d at 186. However, in conceding that no objection was made, respondent requests that we consider the issue under the plain error exception to waiver.

¶ 103   The plain error doctrine is an exception to this general rule. *Enoch,* 122 Ill. 2d at 189.  Plain error encompasses those errors which are obvious, which affect substantial rights of the accused, and which, if uncorrected, would be an affront to the integrity and reputation of the judicial system. *People v. Campbell,* 264 Ill. App. 3d 712, 725 (1992). The plain error rule applies where evidence is closely balanced, or where error is of such magnitude that commission thereof has denied the accused a fair and impartial trial or may have significantly affected the outcome of the case. *People v. Ward,* 154 Ill. 2d 272, 294 (1993). In order to determine if there is plain error, we must first determine whether there is error, requiring a "substantive look at it."  *People v. Rinehart*, 2012 IL 111719, ¶ 15.

¶ 104   In reviewing whether it was error for this court to admit Nigel's prior statement, we reiterate that a prior statement may be admissible as substantive evidence under section 115-10.1 if it is inconsistent. 725 ILCS 5/115-10.1 (West 2018). The record indicates that Nigel provided a videotaped statement under oath, and that he was subject to cross-examination at trial. As such, any inconsistent statements he made in the videotaped statement were properly admitted as

substantive evidence under sections 115-10.1(a), (b) and (c)(2)(B). 725 ILCS 5/115-10.1 (West 2018). The record reflects that Nigel's prior statement was not only inconsistent with his trial testimony, but his trial testimony was also evasive, and he often changed his position. See *People v. Cook*, 2018 IL App (1st) 142134, ¶ 43 ("The term 'inconsistent' in section 115-10.1 is not limited to direct contradictions but also includes evasive answers, silence, or changes in position").

¶ 105   At trial, Nigel testified that: on the night of the shooting, respondent approached the group alone; he did not recall knowing respondent by any nicknames; he saw respondent raise a gun and point it at Kimon, he did not hear respondent say anything when he raised the gun.

¶ 106   When Nigel was presented with his videotaped statement in court, he responded that he did and did not remember giving answers to questions that were almost identical. During his videotaped statement, Nigel stated that: the respondent approached the group with two other people; respondent's nickname was "Little Black"; respondent pointed the gun at someone named "Darnell" prior to pointing it at Kimon; respondent was not silent and said "don't nobody move"; and that he knew respondent from the neighborhood and parties. Therefore, we find that Nigel's testimony was properly admitted under section 115-10.1 of the Code. Because there was no error, there was no plain error.

¶ 107                              3.  Respondent's Alibi Witnesses

¶ 108   Respondent's insistence that the lack of credibility afforded his alibi witnesses somehow amounts to error, and that there were numerous credibility issues with the State's witnesses, is perplexing. It was the function of the jury to determine the credibility of the alibi witnesses and of the weight to be given to the totality of the testimony. We cannot overturn the verdict of the jury simply because the evidence presented to it was conflicting. *People v. Brown*, 52 Ill. 2d 94, 105-06 (1972). Our Illinois supreme court is clear that the jury was not obligated to accept alibi

testimony over the positive identification of an accused. *People v. Berland*, 74 Ill. 2d 286, 307 (1978). A reviewing court should not substitute its judgment for that of the trier of fact. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 109   In addition, respondent's ex-girlfriend, Brittany, came forward as an alibi for respondent approximately two years after the shooting occurred and could not recall critical details of the evening that would have established a more credible alibi. See *Cook,* 2018 IL App (1st) 142134, ¶ 78 ("defendant's family members never informed the police of this alibi after they learned that defendant was arrested"). Ms. Murphy's testimony in court that she was with respondent at 10:55 p.m., was not consistent with her prior statement to police officers when she was initially questioned a few days after the shooting that she was with respondent at 10:00 p.m.

¶ 110   It was the jury's function to determine the credibility of the alibi witnesses and the appropriate weight to afford to their testimony. *Brown*, 52 Ill. 2d at 105-06. We will not substitute our judgment for theirs.

¶ 111                    B.  Detective DeCicco's Trial Testimony

¶ 112   Next, respondent argues that statements elicited during the State's examination of Detective DeCicco were an impermissible use of respondent's post-arrest silence and violated his right to a fair trial. Respondent concedes that this argument is waived but, once again, requests review under plain error. Before determining whether plain error applies, we must first determine whether an error occurred. *Rinehart*, 2012 IL 111719, ¶ 15.

¶ 113   During Detective DeCicco's testimony, the State asked, "Detective, at any time when you were interviewing the defendant Keon Frazier with his mother present did she ever tell you that Keon Frazier was present with her at 10:55 p.m.?" Detective DeCicco responded, "No, she did not or he did not either." There was no objection by defense counsel. Respondent argues that this

is reversible error because the exchange violated respondent's right to remain silent and the inadmissible evidence of his post-arrest silence, and the implication that respondent gave an interview in which he failed to mention his alibi, which was his sole defense at trial, was a violation of his constitutional right against self-incrimination since it placed the onus on respondent to have declared his innocence to the arresting police officer and that this strategy shifted the burden of proof.

¶ 114   The State argues that the record is clear that it did not elicit this testimony about respondent and the question was strictly limited to Ms. Murphy's statements and silence and that the State did not make any reference to Detective DeCicco's unsolicited comment during closing argument. We believe that the State's question did implicate that the detective interviewed respondent although respondent did not testify at trial. "Generally, remarks by a prosecutor regarding a defendant's post-arrest silence are improper when used to create an inference of guilt." *People v. Anderson*, 2018 IL App (4th) 160037, ¶ 56 (citing *People v. Edwards*, 309 Ill. App. 3d 447, 454 (1999)). In addition, the detective should not have been allowed to refer to respondent's silence. *Anderson*, 2018 IL App (4th) 160037, ¶ 56.

¶ 115   However, in this case, defense counsel opened the door to this testimony during the direct examination of respondent's mother. Based upon this fact and the fact that the evidence was not closely balanced, there was sufficient evidence presented at trial to support the jury's verdict. See *Anderson*, 2018 IL App (4th) 160037, ¶ 62 (citing *People v. Kliner*, 185 Ill. 2d 81, 153 (1998)) ("Our supreme court has held that otherwise improper argument by the State will not be considered error when the comments are based on reasonable inferences drawn from the evidence or invited by the closing argument of defense counsel").

¶ 116    In addition, this question by the State and response by the detective did not create an inference of guilt; the other overwhelming evidence did. Jazmine, Kenterious and Jawon all testified similarly and consistently regarding the facts surrounding the shooting.  They all saw respondent point a gun at Kimon right before they heard shots fired. Montreal admitted that he saw respondent shoot Kimon.  In fact, Montreal stated that he was standing right next to Kimon and was able to clearly describe the gun respondent used to shoot Kimon including the flash of light as the bullet exited the gun.  Therefore, plain error does not apply, and we will honor the procedural waiver. *Irwin*, 2017 IL App (1st) 150054, ¶ 26.

¶ 117    In the alternative, respondent urges that defense counsel's failure to object during Detective DeCicco's testimony amounts to ineffective assistance of counsel.  We disagree.

¶ 118    Although there is no constitutional right to counsel in proceedings pursuant to the Juvenile Court Act, a statutory right is granted under the Act. *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 32. Illinois courts apply the standard utilized in criminal cases to gauge the effectiveness of counsel in juvenile proceedings.  *In re S.G.,* 347 Ill. App. 3d at 479 (citing *Strickland v. Washington,* 466 U.S. 668 (1984)). Generally, in order to establish ineffective assistance of counsel, one must show both that counsel's representation fell below an objective standard of reasonableness and that a reasonable probability exists that, but for the error, the result would have been different." *Charles W.*, 2014 IL App (1st) 131281, ¶ 32. The prejudice prong requires a reasonable probability, not just a mere possibility, of a different outcome. *Id*. Counsel's conduct is presumed to be the product of sound trial strategy, and respondent bears the burden of overcoming this presumption. *Id.*, citing *People v. Simms,* 192 Ill. 2d 348, 361 (2000).

¶ 119    For the reasons previously stated, respondent cannot establish prejudice here or argue that there was a possibility that the result would have been different but for these errors where

respondent had already opened the door and the jury had already heard the tape that respondent was present during the interview with his mother.

¶ 120                          C. State's Closing Argument

¶ 121   Respondent further argues that the State's substantive use of Nigel and Gjuana's statements in its closing argument substantially prejudiced him.  Once again, this issue has been waived because respondent did not object during the State's closing argument.  Furthermore, we find no error here.  The State's statement to the jury that, "[Y]ou can take those prior statements as if they're from this witness stand" was not improper.  Because there was no error there cannot be plain error. *Irwin*, 2017 IL App (1st) 150054, ¶ 26.

¶ 122                          D.  Cumulative Errors

¶ 123   Finally, respondent argues that the cumulative errors committed during his trial denied him a fair trial. Ordinarily, a new trial is not warranted where a respondent raises several contentions of error, none of which rise to the level of reversible error, because " '[t]he whole can be no greater than the sum of its parts.' " *Irwin*, 2017 IL App (1st) 150054, ¶ 57. Nevertheless, there may be circumstances where the cumulative impact of otherwise harmless errors deprives a defendant of a fair trial and mandates reversal. *Id*. That is not the case here. Given the overwhelming nature of the evidence, which was essentially uncontradicted by the respondent, any errors we have identified, even when considered cumulatively, do not rise to this level. *Id.*; see also *Brandon P.*, 2013 IL App (4th) 111022, ¶ 57-59.

¶ 124                          E.  Respondent's Sentence

¶ 125   The parties agree that respondent's order of commitment should have been corrected to reflect a single conviction and sentence for first degree murder where there was only one death.

Reviewing the record, the order of commitment relating to the suspended adult sentence currently reflects two convictions for first degree murder.

¶ 126   "When the mittimus does not correctly reflect the jury's verdicts and the court's oral pronouncement of the defendant's sentences, the proper remedy is to amend the mittimus to conform to the judgment and oral pronouncement." *People v. Jackson*, 2016 IL App (1st) 133823, ¶ 77, citing *People v. Carlisle,* 2015 IL App (1st) 131144, ¶¶ 87–88.   However, remand is unnecessary, as this court may correct the mittimus at any time. *People v. Hunter*, 2016 IL App (1st) 141904, ¶¶ 79-81.   Therefore, we direct the clerk of the circuit court to amend the mittimus accordingly.

¶ 127   As a final matter, we note that respondent received an EJJ.  Under EJJ, if respondent successfully completes his juvenile sentence, he will not have to serve his adult sentence.   In this case, the judge determined that if respondent does not successfully serve his juvenile sentence, which will be served until he reaches the age of 21, he will be sentenced to an additional 48 years in prison as an adult.   Pursuant to the Illinois Supreme Court's recent decision in *People v. Buffer*, 2019 IL 122327, ¶ 41, "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment."   Because respondent's adult sentence is contingent upon whether he successfully completes his juvenile sentence, we need not determine here whether respondent's sentence amounts to a *de facto* life sentence which would require resentencing to reduce it to 40 years.

¶ 128                                        III.  CONCLUSION

¶ 129   For the foregoing reasons, we affirm the judgment of the trial court and order the mittimus corrected.

¶ 130   Affirmed; mittimus corrected.